Filed 4/25/13  P. v. Valdez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053309 |
| v. | (Super.Ct.No. RIF127749) |
| MARTIN LEYVA VALDEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Paul E. Zellerbach and Helios (Joe) Hernandez, Judges.* Affirmed with directions.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*      Judge Zellerbach presided over the first trial, which resulted in guilty verdicts on charges of assault with a firearm (count 5) and robbery (count 6).  Judge Hernandez presided over the second trial, which resulted in guilty verdicts on charges of murder (count 1) and attempted murder (counts 2-4).

On Christmas Day 2005, defendant Martin Leyva Valdez fired four slug rounds from a shotgun through the front door of a house. He killed an 11-year-old boy. He missed the boy's parents and brother, who watched the boy die.

Defendant was a member of the Casa Blanca gang. The night before — on Christmas Eve — a member of the Hillside gang had shot and injured several members of Casa Blanca. Defendant evidently intended to retaliate by firing into the house of the Hillside shooter. By mistake, however, he fired into a very similar house just three doors away down the street.

While making his getaway, defendant used the shotgun to menace a potential witness. There was also evidence that defendant forcibly stole a carton of beer from a stranger.

Defendant was charged with:

Count 1: Murder (Pen. Code, § 187, subd. (a)), with a gang special circumstance (Pen. Code, § 190.2, subd. (a)(22)) and with gang (Pen. Code, § 186.22, subd. (b)) and firearm (Pen. Code, § 12022.53, subd. (d)) enhancements.

Counts 2, 3, and 4: Attempted murder (Pen. Code, §§ 187, subd. (a), 664), with gang and firearm enhancements.

Count 5: Assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with a gang enhancement.

Count 6: Robbery. (Pen. Code, § 211.)

In the first guilt trial, the jury was unable to reach a verdict on counts 1-4 (murder and attempted murder).  However, it found defendant guilty on counts 5-6 (assault with a firearm and robbery), and it found the gang enhancement on count 5 true.

In the second guilt trial, the jury found defendant guilty on counts 1-4; it found that the murder was first degree, and that the attempted murders were willful, deliberate, and premeditated.  It found all related special circumstances and enhancements true.

In the penalty phase, the jury returned a verdict of life without parole.

Defendant was sentenced to life without parole, plus 70 years to life, plus 9 years, along with the usual fines and fees.

Defendant now contends:

1.  There was insufficient evidence of intent to kill to support the murder and attempted murder convictions.

2.  There was insufficient evidence to support the gang enhancement on count 5 (assault with a firearm).

3.  The trial court violated *Miranda*[2] by admitting evidence that, in a booking interview, defendant claimed a gang.

4.  The prosecutor violated due process by taking conflicting positions and presenting contradictory evidence concerning the booking interview.

---

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

3

5.  In the first trial, the trial court erred by admitting photos found on MySpace, because they were not properly authenticated.

6.  In the second trial, defense counsel rendered ineffective assistance by failing to object to the MySpace photos.

7.  Defense counsel rendered ineffective assistance by failing to object to evidence of certain crimes committed by and against other members of Casa Blanca.

8.  Defense counsel rendered ineffective assistance by failing to request CALCRIM No. 375, regarding evidence of uncharged crimes, and CALCRIM No. 1403, regarding the limited purpose of gang evidence.

9.  The abstract of judgment erroneously reflects a parole revocation restitution fine.

Aside from the error in the abstract of judgment — which the People concede — we find no error.  Hence, we will affirm the judgment, but we will direct the trial court clerk to correct the abstract.

I

FACTUAL BACKGROUND

A.      *Prosecution Evidence*.

1.      *Gang evidence*.

Casa Blanca is a gang that claims the Casa Blanca neighborhood of Riverside, including Villegas Park.  It is also known as "Casa Blanca Rifa" or "Riva."  Evans Street

4

and Fern Street are cliques within Casa Blanca; even though they are part of the same gang, there is a feud between them.

The primary activities of Casa Blanca are violent assaults, including murders and attempted murders. A pattern of gang activity was shown by the following predicate offenses:

1. In April 2001, Carlos Deharo, a member of Evans Street, shot a member of Fern Street. He was convicted of assault with a deadly weapon.

2. In March 2002, Abacuc Guevera, a member of Fern Street, shot and killed two people, including a member of Evans Street. He was convicted of murder.

3. In August 2003, Michael Robles, a member of Evans Street, fired shots at people leaving a party. He was convicted on multiple counts of attempted murder.

In April 2002, a police officer encountered defendant in Villegas Park. He admitted to her that he belonged to Casa Blanca.

Around December 2002, defendant got Casa Blanca tattoos on his arms.

In June 2003, defendant told his probation officer that he "claimed" Casa Blanca. He added that he did not claim any particular clique because he had family members on both sides.

Starting sometime in 2004, defendant was out of the area — first in Butte County, and then in South Dakota — training to become a firefighter. In August 2005, he returned to Riverside.

5

In December 2005, when defendant was booked for the current crimes, he was asked about his gang affiliation; he replied that he was an affiliate of Casa Blanca.

A gang expert concluded that defendant was a member of Casa Blanca.

2. *Christmas Eve: the prior shooting in Hillside*.

Casa Blanca was at war with another gang called Hillside.

On December 24, 2005, there was party in the backyard of a home in the Hillside neighborhood. The guests included Alejandro (or Alex) Moreno, a member of Hillside. They also included Michael Rangel, a member of Casa Blanca.

When Rangel arrived, Moreno asked him, "Where are you from?" Rangel answered, "Casa Blanca." Moreno yelled, "Hillside." They started fistfighting. Then Moreno pulled out a gun and started shooting.[3] Rangel was shot in the leg and scrotum. Rangel's friends, Francisco (or Frank) Gonzales, Gabriel Halcon, and Randy Lozano, were also hit. In the opinion of a gang expert, Gonzales, Halcon, and Lozano were all members or associates of Casa Blanca. Moreno was eventually convicted on four counts of attempted murder.

Defendant and Rangel were very close friends. Defendant went to the hospital and talked to Rangel's family to find out how he was. On Christmas Day, in the wee hours, Rangel was discharged.

---

[3] At the second trial, there was evidence that there was another shooter in addition to Moreno.

3.    *Christmas day:  the robbery at the market*.

On December 25, 2005, around 4:40 p.m., one Jorge (or George) Perez bought a carton of beer at a market in the Casa Blanca neighborhood.  Outside, in the parking lot, a man punched him, took the beer, and drove off in a black car.[4]

The owner of the store recognized the robber as a regular customer.  He wrote down the license number of the black car.  Defendant owned a black Lincoln with tinted windows.  The number the store owner wrote down was only one number off from defendant's license number.  In a photo lineup, the store owner identified defendant as the robber.  An employee of the store likewise identified defendant.

4.    *Christmas night:  the shooting at the Miranda house*.

Moreno lived at 6276 Antioch Avenue.  Meanwhile, the Miranda family — Oscar, Jacqueline, 11-year old Max, and 10-year-old Joban — lived at 6330 Antioch.  Both houses appeared similar, from the outside, and they were separated by just two other houses.

A person approaching the Miranda house would have seen, from left to right:  the window of the front bedroom; the two high windows of a bathroom; roughly in the middle of the house, the front door; and then the window of the kitchen and dining area. The garage, on the far right, projected out from the rest of the house, blocking most of the dining area.

---

[4]    In the first trial, witnesses specified that the black car was a Lincoln.

On December 25, 2005, around 8:00 p.m., someone armed with a 12-gauge shotgun fired four slug rounds through the closed front door.

Inside the front door was a hallway that ran to the rear of the house. When the shooting started, Max was in the front bathroom, on the left; the rest of the family was in the living room, on the right, behind the kitchen. Max ran toward his parents. As he was crossing the hallway, another shot hit him in the chest. He died within seconds.

Slug rounds will penetrate walls and keep going. Two rounds were recovered from the walls of the house. The other two rounds exited through a rear window and could not be found. From top to bottom, the entrance holes in the door were only about a foot and a half apart.

Meanwhile, at the house across the street, three children were out in the garage; the garage door was open. They saw a black car stopped in the middle of the street. It had tinted windows, and its headlights were off. The children heard shots. Then the car drove away. They could see that, over at the Miranda house, the bathroom and kitchen lights were on.

Defendant's cell phone records showed that, at 7:58 p.m., he was near his own home. At 8:07 p.m., he was near the Miranda home but headed back toward his own home.

In the opinion of a gang expert, the shooting was committed in retaliation for Moreno's Christmas Eve shooting of Rangel and other Casa Blanca members and thus for the benefit of Casa Blanca.

5.    *Christmas night:  the postshooting assault.*

Jesse (or Jess) Valenciano lived on Antioch.  On December 25, 2005, as he and his wife were in their pickup truck nearing their home, he heard gunshots.  To turn left onto Antioch, he had to go around a black Lincoln sedan with tinted windows that was stopped on Antioch, at the stop sign.  The driver of the black Lincoln rolled down his window and said, "[W]here you from, homeboy?"  Valenciano just smirked, because he "d[id]n't relate to anything like that."

The driver sat up, however, and Valenciano could see the barrel of a shotgun that he was holding.  Next, Valenciano heard the sound of the shotgun being racked.  Valenciano "hit the gas"; looking back, he saw the black sedan turn and leave the scene.  He went home and called 911.

In a photo lineup, Valenciano identified defendant as the driver with the shotgun.  Later, he also identified defendant's car.  At trial, he once again identified defendant as the driver.

6.    *Christmas night:  the postshooting gathering.*

On Christmas night, a number of Rangel's friends gathered at his house.  One was Albert Magallon, the godson of Rangel's father.

According to Magallon, sometime around 9:00 or 9:30 p.m., defendant arrived.  Meanwhile, Magallon noticed a black car parked outside, which had not been there earlier.

9

Defendant indicated that he had gone up to a door or a house and committed a shooting. He made a gesture of holding "a shotgun or some kind of rifle." He spoke with "bravado . . . , like he was proud of what he had just done." He appeared to be drunk.[5] Magallon got the impression that defendant was from the Casa Blanca gang.[6]

On December 29, 2005, gunshot residue was found on the gearshift of defendant's black Lincoln. It could have been transferred there from the driver's hand.

B.    *Defense Evidence.*

1.    *Evidence introduced in both trials.*

At least until 2002 or 2003, defendant and Moreno were friends. Thus, defendant had been to Moreno's house many times.

The defense called its own gang expert.[7] He testified that Casa Blanca was not a gang; it was a merely a neighborhood in which there were several gangs, including Evans Street and Fern Street. Moreover, in his opinion, the shooting was not committed for the benefit of a gang.[8] Killing an 11-year-old boy would actually make a gang lose respect.

---

[5]    Earlier, at 8:08 p.m., defendant had talked to a cousin on the phone; he sounded "[n]ormal," not drunk.

[6]    After Magallon learned that an 11-year-old boy had been killed, he called the police anonymously and reported what he had observed. Based on the anonymous caller's voice, Rangel's mother identified him as Magallon; in exchange, Rangel received a reduced sentence on pending robbery and other charges.

[7]    In the first trial, the defense gang expert was Enrique Tira. In the second trial, it was Randal Hecht.

[8]    In the first trial, the expert added that the shooting was a drive-by shooting, which would reflect negatively on a gang.

*[footnote continued on next page]*

2.  *Defendant's testimony in the first trial.*

In the first trial, defendant took the stand. He testified that, on Christmas day, he was drinking; thus, there were gaps in his memory. He admitted taking the beer from the customer at the market. He also admitted firing a shotgun at what he thought was Moreno's house. He testified, however, that he only intended to scare Moreno.

Just the day before, an acquaintance had insisted that defendant take the shotgun as "protection," because defendant was going to Moreno Valley. Defendant claimed he did not know what type of ammunition was in it.

Defendant denied being a gang member. He testified that he got a "Casa Blanca" tattoo to show pride in his neighborhood.

When he was booked, defendant testified, the booking officer did not ask him if he was affiliated with a gang. Rather, the booking officer asked, "Do you want me to put you . . . with the people from Hillside or the people from Casa Blanca?" Because he was accused of a shooting in Hillside, he asked to be put with the people from Casa Blanca.

3.  *Additional evidence in the first trial.*

As of December 2005, Angelica Galceran was defendant's girlfriend. She testified that she saw no indication that defendant was in a gang. However, she added that, as far as she knew, he had no friends.

---

*[footnote continued from previous page]*

In the second trial, the expert added that the shooting could have been a "personal vendetta," because defendant and Rangel were close friends.

11

Leah Hernandez, another one of defendant's girlfriends and the mother of his child, similarly saw no indication that defendant was a gang member. She agreed, however, that if he was a gang member, he would not necessarily tell her, because she was "against gang membership."

## II

## EVIDENCE OF INTENT TO KILL

Defendant contends that, at the second trial, there was insufficient evidence of intent to kill to support his murder and attempted murder convictions.

"In reviewing a criminal conviction challenged as lacking evidentiary support, '"the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)

"We ""'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a

single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

"When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment. [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

Subject to exceptions that do not apply here, first degree murder requires the intent to kill. (Pen. Code, § 189; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.) Likewise, "'"[t]he crime of attempted murder requires a specific intent to kill . . . [.]" [Citation.]' [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 664.) And finally, the gang special circumstance also required the intent to kill. (Pen. Code, § 190.2, subd. (a)(22).)

An intent to kill exists when "the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 178.) "[I]ntent to kill . . . may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 741.) "[E]vidence of motive is often probative of intent to kill." (*Ibid.*)

There was ample evidence that defendant intended to kill at least one person. His obvious motivation was to retaliate against Moreno for the Christmas Eve shooting. It was Christmas night, when people are extremely likely to be at home. A van was parked in the driveway, and lights in the house were on, confirming that someone was inside.

Defendant used slug rounds, which can penetrate walls. An expert testified that slug rounds create a "horrendous wound channel" and thus increase the chances of death by blood loss, even when they hit an otherwise nonvital area.

Defendant cites the prosecution gang expert's testimony that gang retaliation may involve either the same amount of force or greater force; defendant then argues that, as no one had been killed in the Christmas Eve shooting, "retaliation did not necessarily require that anyone be killed in return." This misapplies the standard of review, which requires us to draw all reasonable inferences in favor of the judgment. In the Christmas Eve shooting, Moreno had fired multiple shots, hitting Rangel in the scrotum and the leg. Defendant could reasonably believe that Moreno was attempting to kill, but missed. If so, retaliation with equal force would mean attempting to kill.

Alternatively, the jury could infer that defendant actually chose to retaliate with greater force. Unlike Moreno, who engaged with his enemies in a fistfight before shooting at them, defendant snuck up on his victims. Also, unlike Moreno, who used a handgun, defendant used a shotgun, with powerful ammunition.

Defendant also argues that intent to kill requires a "'substantial certainty' that a person would be killed . . . ." Not so. As already mentioned (and as defendant himself notes elsewhere in his brief), it requires that "the assailant *either* desires the victim's death, *or* knows to a substantial certainty that the victim's death will occur. [Citation.]" (*People v. Booker*, *supra*, 51 Cal.4th at p. 178, italics added.) Here, if defendant just wanted to scare Moreno, he could have fired up toward the ceiling or down toward the

14

floor; he could also have fired into the garage, to his right. Instead, he fired straight through the door, into the living area, roughly at level height. Admittedly, there was no way he could be substantially certain that he would kill someone. At the same time, however, there was no way he could be substantially certain that he would *not* kill someone. Thus, the jury could reasonably conclude that he did not merely want to scare someone; he hoped and desired to kill someone.

Defendant therefore also argues that, even if there was sufficient evidence that he intended to kill one person, there was insufficient evidence that he intended to kill four people. However, he chose to fire four separate rounds. This was evidence that he hoped and desired to kill four people.

As the People argue, this case resembles *People v. Vang* (2001) 87 Cal.App.4th 554. There, two shooters in a car, one armed with an assault rifle and one armed with a shotgun, fired at a duplex at least 50 times, leaving one injured victim and one dead victim. An occupant who had been standing out in front of the duplex was miraculously unhurt; two other occupants were likewise uninjured. (*Id*. at p. 558.) The shooters had mistaken the duplex for the one next door, where a rival gang member had lived until recently. (*Id*. at pp. 559-560, 562.)

On appeal, the two defendants conceded that the evidence showed that they intended to kill the uninjured occupant who was outside, but they argued that it did not support attempted murder convictions with respect to the two uninjured occupants who were inside. (*People v. Vang*, *supra*, 87 Cal.App.4th at p. 563.) The appellate court

15

noted, "Defendants' argument might have more force if only a single shot had been fired in the direction of [the occupant who was outside]." (*Id*. at p. 564, fn. omitted.) It held, however: "The jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up. [Citations.] . . . [D]efendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at [an] inhabited dwelling[]. The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*Id*. at pp. 563-564.)

Defendant tries to distinguish *Vang*, arguing that he fired slugs — not shot — and all in roughly the same direction. Nevertheless, as in *Vang*, it is significant that he fired more than once, which supports an inference that he desired to kill more than one person. (See *People v. McCloud* (2012) 211 Cal.App.4th 788, 805-807 [defendant who fired 10 shots into group of over 400 people, killing two, could be convicted on two counts of murder and not more than eight counts of attempted murder]; cf. *People v. Perez* (2010) 50 Cal.4th 222, 224-225 [defendant who fired one shot into group of eight people, hitting one, could not be convicted of more than one count of attempted murder].) Also as in *Vang*, he fired high-powered, wall-piercing ammunition at an inhabited dwelling.

Defendant claims that the evidence showed that he was a "skilled" shooter who aimed "at a single spot on the front door [citation], and placed his shots close together in

16

the targeted area." He argues that this "refuted any inference that [he] intended to kill everyone in the house." (Fn. omitted.) This assumes that he believed that the occupants were spread out, rather than near each other. However, it was just as likely that they were collected together somewhere (particularly on Christmas night); indeed, until moments earlier, all four of them had in fact been together in the living room. At oral argument, defendant's counsel conceded that, if four people had been hit, there would be sufficient evidence of intent to kill four people. However, as defendant could not know for certain whether he would or would not hit anybody, his intent necessarily was the same no matter how many people were hit. Defendant fired at the door, in the middle of the house; as the People note, this is symbolically the "heart" of the house.

More generally, this argument assumes that defendant actually thought about where exactly the occupants might be. The jury, however, was not required to assume this. Defendant repeatedly uses the example of a shooter who fires into a glass house and who carefully avoids targeting individuals he can see inside. At the risk of stating the obvious, however, the house was *not* glass, and defendant could *not* see inside. He did not necessarily even have a mental picture of the inside. While there was evidence that the exterior of Moreno's house resembled the exterior of the victims' house, there was no evidence that the interiors of the two houses were similar.

We therefore conclude that there was sufficient evidence that defendant fired each shot with the intent to kill a person, and we reject defendant's arguments to the contrary.

17

EVIDENCE THAT THE ASSAULT WITH A FIREARM WAS GANG RELATED

Defendant contends that, at the first trial, there was insufficient evidence to support the gang enhancement on count 5 (assault with a firearm).

A.    *Additional Factual and Procedural Background.*

At the first trial, the prosecution gang expert testified that the assault on Valenciano benefited Casa Blanca. He explained that "that type of conduct instills fear into the community, and therefore, the community is apprehensive to assist law enforcement or maybe even call the police . . . ."

Valenciano was, in fact, intimidated. He hit the gas and "[s]ped off." Instead of going home, however, he stopped in the middle of the block; he explained that defendant's car "was still stopped at the stop sign, and I did not want him or anybody else to know where I turned into . . . to go to my house." He did not actually go home until he saw defendant's car turn and leave.

He then called 911; however, he refused to give his name, because he was still concerned about the safety of his family. The police were able to contact him only because a witness who had seen the confrontation described his Silverado. Even then, he was reluctant to give his name or to get involved, because he was concerned about his family's safety. He changed his mind only after the police told him "that an 11-year-old boy was shot."

B.      *Analysis*.

A gang enhancement requires that the defendant commit the underlying felony both (1) "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (Pen. Code, § 186.22, subd. (b)(1).)  "[E]xpert testimony is admissible on the issue of '"whether and how a crime was committed to benefit or promote a gang."'  [Citations.]"  (*People v. Williams* (2009) 170 Cal.App.4th 587, 621 [Fourth Dist., Div. Two].)

Here, defendant had just committed a shooting and potential multiple murder. There was massive evidence that the shooting was gang motivated, to retaliate for the Christmas Eve shooting.  Successfully completing the retaliatory shooting — which meant not only committing it, but also getting away with it — would benefit defendant's gang.  Moreover, it is almost tautological that getting away with it would "promote, further, or assist in" the shooting itself.  (See *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1261 [stealing cell phone benefited gang where it prevented witness from reporting earlier crime to police].)

Defendant notes that, when he said, "[W]here you from, homeboy?," Valenciano smirked; defendant argues that, at that point, Valenciano was not intimidated.  The crime, however, was not asking Valenciano where he was from; it was assaulting Valenciano with a shotgun.  As noted, the assault intimidated Valenciano very effectively.

19

Defendant also notes that he did not call out any gang name, throw any gang signs, or display any gang clothing; thus, Valenciano had no way of knowing what gang defendant was from. Indeed, as the assault took place in Hillside territory, Valenciano might well have assumed that defendant was from Hillside. Certainly this is not a case in which defendant was trying to intimidate a random passerby to gain fear and respect for a particular gang. However, a jury could reasonably conclude that he was trying to intimidate a witness. Moreover, by asking "[W]here you from, homeboy?," defendant did indicate that he was affiliated with *some* gang. Under these circumstances, it does not matter that the witness did not know *what* gang. All that mattered was that defendant had committed the *shooting* for the benefit of his gang, and thus, witness intimidation by means of assault *also* benefited his gang.

Finally, defendant argues that Valenciano "likely" initiated the confrontation, by "mak[ing] a rude gesture . . . or yell[ing] at him for taking up the left half of the street." This is sheer speculation. It is purportedly based on two facts: (1) Valenciano had to drive slowly to make the tight turn around defendant's car, and (2) a witness who saw the confrontation reported hearing "angry, like yelling" voices coming from the two vehicles. Valenciano's account, however, did not include any yelling. The jury could reasonably conclude that he was not rude or angry.

Separately and alternatively, even assuming that Valenciano *did* initiate the confrontation, the jury could *still* find that defendant assaulted him to benefit his gang. After committing the shooting, and while still at the scene, the last thing defendant

20

needed was to get involved in a road-rage incident. The jury could reasonably conclude that he assaulted Valenciano to cut the confrontation short while simultaneously intimidating Valenciano, the better to make a successful getaway.

Finally, defendant argues that "substantial evidence must undergird the expert's opinion . . . ." However, there was "an underlying evidentiary foundation" for the expert's testimony. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 659.)

We therefore conclude that there was sufficient evidence to support the gang enhancement to count 5.

IV

EVIDENCE THAT, IN A BOOKING INTERVIEW,

DEFENDANT ADMITTED BEING A GANG MEMBER

Defendant contends that the trial court erred in both trials by overruling his *Miranda* objection to evidence that he claimed a gang during a booking interview.

Defendant also contends that the prosecutor violated due process by taking conflicting positions and presenting contradictory evidence concerning the booking interview.

A. *First Trial: Motion to Suppress*.

1. *Additional factual and procedural background*.

Before the first trial, defendant filed a written motion on *Miranda* grounds to suppress his statement, made in the booking interview, that he was a member of Casa Blanca. The prosecution filed a written opposition, arguing that the statement was within

21

the booking question exception to *Miranda*. Accordingly, the trial court held a hearing pursuant to Evidence Code section 402.

The only witness at the hearing was Deputy Donald Byrd. Deputy Byrd testified that he interviewed arrestees at the Riverside County jail, including defendant, for classification purposes. Pursuant to the standard classification questionnaire, all arrestees were asked about their gang affiliation. That question was included so fellow gang members could be housed together and rival gang members could be housed separately, for their own protection. Deputy Byrd admitted, however, that arresting officers can get access to a classification questionnaire and can use it to identify an arrestee as a gang member.

Deputy Byrd would have had a copy of defendant's "receiving sheet," which would have indicated the "type of arrest." Defendant's receiving sheet indicated that he was charged with murder and assault with a deadly weapon; however, it did not mention any gang charges or allegations.

But Deputy Byrd also would have had — and would have read — defendant's "[p]robable [c]ause [s]tatement," which is "a synopsis of what happened or why [he] got arrested." Defendant's probable cause statement included an anonymous tip that the shooting had been carried out to retaliate for a shooting of Casa Blanca gang members.

After hearing argument, the trial court ruled that defendant's statement was admissible.

2. *Analysis*.

The controlling case is a recent case decided by this court, *People v. Gomez* (2011) 192 Cal.App.4th 609. In *Gomez*, much as in this case, the trial court denied the defendant's motion to suppress his statement during his booking interview, in which he admitted being an active member of a particular gang and gave his moniker. (*Id.* at pp. 615, 625.) The prosecutor asserted that every arrestee was routinely asked about gang affiliation, for safety reasons. (*Id.* at p. 625.) At trial, the officer who had interviewed the defendant confirmed that he asked such questions routinely, for housing and safety purposes, and that he did not investigate the incident that led to any inmate's arrest. (*Id.* at pp. 626-627.)

We began by stating the applicable standard of review: "When a defendant challenges the admissibility of defendant's postarrest statements on the ground they were elicited in violation of *Miranda*, the People have the burden of proving by a preponderance of the evidence that the statements were not the product of a *Miranda* violation. [Citations.] In reviewing a trial court's ruling on a motion to suppress based upon a violation of *Miranda*, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." [Citation.]' [Citation.]" (*People v. Gomez, supra*, 192 Cal.App.4th at p. 627.)

We noted that the United States Supreme Court had recognized a "routine booking question exception to *Miranda*" (*People v. Gomez, supra*, 192 Cal.App.4th at p. 630), which applies to responses "to questions 'reasonably related to the police's administrative concerns.'" (*Id.* at p. 634, italics omitted; see also *id.* at p. 629.) "The fact that the information gathered from routine booking questions turns out to be incriminating does not, by itself, affect the applicability of the exception. [Citations.]" (*Id.* at p. 629.) We cautioned, however: """Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.'" [Citation.]" (*Ibid.*, fn. omitted.)

We added: "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information. [Citation.] Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the

24

guise or pretext of seeking routine biographical information [citations]." (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 630-631.)

In the case before us, we concluded:  "Whether the administrative purpose is a mere guise or pretext for questions actually designed to elicit incriminating responses is a close question.  Given the prevalence of gang-related offenses, questions about an arrestee's gang affiliation are, by their nature, more likely to be incriminating than basic identifying questions about one's name, address, and age. . . .

"[However,] we cannot say on this record that the gang-related questions asked of defendant are outside the booking question exception.  The questions appear to have been asked in a legitimate booking context, by a booking officer uninvolved with the arrest or investigation of the crimes, pursuant to a standard booking form. . . .  [T]he questions were asked for legitimate, noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff.  Significantly, there is no evidence that [the interviewing officer] had any knowledge of the crimes for which defendant was arrested or was suspected of committing." (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 634-635.)

Here, the record before the trial court when it ruled on the motion to suppress demonstrated that the question about defendant's gang affiliation was a legitimate booking question, rather than a pretext for eliciting incriminating information.  Just as in *Gomez* itself, the question was asked in a legitimate booking context, pursuant to a standard booking form, and by a booking officer who was not involved in the

investigation of crimes. It was reasonably related to administrative concerns about inmate housing and safety. Admittedly, unlike in *Gomez*, there was some question as to whether the booking officer knew that defendant was suspected of committing a gang-related crime. Defendant's receiving sheet indicated that there were no gang charges or allegations; however, his probable cause statement included an anonymous tip that the crime was gang related. In either case, however, Deputy Byrd would have asked the same question of defendant, just as he did of all arrestees. Thus, in the first trial, the trial court properly admitted defendant's statement.

Separately and alternatively, we also note that, even if the trial court's ruling on the motion in limine was erroneous, the error was harmless. Ultimately, in the first trial, defendant took the stand and denied being a gang member. Thus, as defendant concedes, even if his otherwise voluntary statement was obtained in violation of *Miranda*, it became admissible for impeachment. (*Oregon v. Elstad* (1985) 470 U.S. 298, 307-308 [105 S.Ct. 1285, 84 L.Ed.2d 222]; *Harris v. New York* (1971) 401 U.S. 222, 224-226 [91 S.Ct. 643, 28 L.Ed.2d 1].)

      B.    *Conflicting Positions*.

          1. *Additional factual and procedural background*.

              a. *Deputy Byrd's trial testimony*.

At the first trial, Deputy Byrd testified (as he had at the section 402 hearing) that the questions on the classification questionnaire are asked for inmate safety, to make sure

that inmates are housed "with people that they're compatible with."  He then testified that, at booking, defendant had admitted being affiliated with Casa Blanca.

b.  *The defense gang expert's trial testimony*.

The defense gang expert, Enrique Tira, agreed that "jail classification is a housing safety issue."  "[T]he reason they do the jail classification is so they can keep the . . . rival gangs[] apart from each other."

However, Tira added that, in his opinion, when defendant said he was affiliated with Casa Blanca, he meant he was from the *neighborhood* Casa Blanca, not the *gang* Casa Blanca.  Tira explained that there are rival gangs within Casa Blanca, such as Fern Street and Evans Street.  Thus, if defendant was a gang member, for housing purposes, it would have made more sense to identify him by clique.

On cross-examination, the prosecutor tried to shake Tira's opinion on this point. She asked if Tira would be surprised if the jail housed Fern Street members with Evans Street members; Tira said he would.  The prosecutor also asked whether gang members in jail would put aside their rivalries and unite by race; Tira said they would not.

c.  *Deputy Dawley's trial testimony*.

In rebuttal, the prosecution called Deputy Kenneth Dawley.  Like Deputy Byrd, Deputy Dawley worked in the classification unit of the Riverside County jail.

Deputy Dawley agreed that classification questions are asked for purposes of housing.  Contradicting Tira, however, he also testified that there was no jail policy

27

against housing a member of Fern Street with a member of Evans Street. In his opinion, gang members in jail *did* put aside their rivalries and unite by race.

Deputy Dawley then testified:

"Q. . . . [Y]ou usually tend to house the Hispanics together, is that right, regardless of their gang?

"A. Yes.[9]

"Q. Then why do you have them fill out a questionnaire to house them and ask them about their gang affiliation?

"A. The sheet has a bunch of information on it; like their background, their experience.

"Q. But . . . if it doesn't matter and you house them by their race, then why ask them all the other questions?

"A. Their experience matters.

"Q. . . . Experience as far as having been in jail before, their charges or what?

"A. Yes, sir.

"Q. Then why not just house them . . . based on that and not by race?

"A. *We house them on both issues*.

"Q. So which is prioritized? Is it the race or the experience? [¶] . . . [¶]

"[A.] Their experience." (Italics added.)

---

**9**      Deputy Dawley also testified, however, that there is no "policy that . . . inmates of the same race have to be housed together[.]"

28

2.    *Analysis*.

In defendant's view, Deputy Dawley contradicted not only the defense gang expert, Tira, but also the prosecution's own witness, Deputy Byrd:  "Either [Deputy] Byrd or [Deputy] Dawley gave false testimony."  Moreover, the prosecutor violated due process by introducing false testimony and by taking inconsistent positions.

Basically, defendant argues that the prosecution took the position that jail housing *was* based on gang affiliation — and introduced Deputy Byrd's testimony to that effect — so it could take advantage of the booking question exception.  It then took the position that jail housing was *not* based on gang affiliation — and introduced Deputy Dawley's testimony to that effect — to undermine Tira.  Finally, in the second trial, it reverted to the position that jail housing *was* based on gang affiliation.

Defense counsel never objected below based on either prosecutorial misconduct or due process.  Accordingly, these particular contentions have been forfeited.  (*People v. Thomas* (2012) 54 Cal.4th 908, 937 [prosecutorial misconduct]; *People v. Abilez* (2007) 41 Cal.4th 472, 521, fn. 12 [due process].)

Defendant therefore also argues that defense counsel's failure to object constituted ineffective assistance.  " . . . ""In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a

29

"reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.""" [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.] If the record on appeal ""'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected,"' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

We reject this contention because we do not agree with defendant's strained interpretation of Deputy Dawley's testimony. Actually, all three witnesses — Deputy Byrd, Deputy Dawley, and Tira — *agreed* that the purpose of the questions on the classification questionnaire was to determine housing. The only *disagreement* was as to whether gang affiliation was *more important* than race. Deputy Byrd was not asked to express an opinion on this, and he did not.

Tira opined that gang affiliation was controlling, and hence he would be surprised if Fern Street members were housed with Evans Street members. Deputy Dawley, on the other hand, took a more nuanced approach. He testified that there was no policy that absolutely prohibited housing inmates of different races together. At the same time, however, there was no policy that absolutely prohibited housing members of rival gangs together. This was because, in general, inmates from rival gangs could get along, as long as they were members of the same race.

Defendant claims that Deputy Dawley testified "that the jail does not house inmates by gang affiliation, it houses them by race." Not so. Quite the contrary, he testified that the questionnaire did ask about gang affiliation because this was one of a number of questions about background and experience, and "experience matters." "We house them on both issues." Indeed, as between experience and race, experience mattered more.

Defendant also claims that when Deputy Dawley said "experience," he meant only prior incarceration history, not gang affiliation. It is true that, at one point, Deputy Dawley testified:

"Q. . . . And now, just so we know what you mean by experience, what do you mean by experience? *The amount of time they have been in jail* or what?

"A. Yes. Their experience would go by . . . how long they have been in jail, like throughout their life, their total time. If they have ever been to state prison, what level they were at." (Italics added.)

31

It seems clear, however, that Deputy Dawley was merely agreeing with the suggestion in the question that experience *included* "[t]he amount of time they have been in jail," *along with other factors,* such as "[i]f they have ever been to state prison [and] what level they were at." He was not testifying that experience meant *only* prior incarceration history. And even assuming the answer was ambiguous, he had already testified that — as defendant puts it himself in his brief — "*all the questions on the questionnaire* related to the individual's background and experience . . . ." That would necessarily include the gang affiliation question.

In sum, then, Deputy Dawley never contradicted Deputy Byrd. He never testified that gang affiliation was *irrelevant* to housing. There was no "false testimony"; the prosecution never took "inconsistent positions." Thus, defense counsel did not render ineffective assistance by failing to raise these issues.

D.    *Second Trial:  Motion to Suppress.*

        1. *Additional factual and procedural background.*

Before the second trial, defendant filed another written motion to suppress his statement during his booking interview that he was a member of Casa Blanca.

The motion asserted:  "Mr. Valdez was asked by Deputy Byrd during his classification what his gang affiliations were. Mr. Valdez testified at the prior trial that Deputy Byrd's inquiry was co[erc]ive. [Citation.] Deputy Byrd could clearly see the tattoos on Mr. Valdez's arms. His inquiry RE: classification, and threatening to put him with Hillside was designed solely and specifically to intimidate Mr. Valdez and get him to

32

admit his gang affiliation. It is a coerced and non[-]voluntary statement." It cited defendant's testimony at the first trial.

The motion also asserted that the statement was inadmissible under *Miranda*. However, it did not cite or discuss either Deputy Byrd or Deputy Dawley's testimony at the first trial. It did not discuss the booking question exception; a fortiori, it did not argue that the booking question here was pretextual.

The prosecution filed a written opposition, arguing that the booking process was not coercive and that the booking question exception applied. Among other things, it noted that defendant's receiving sheet did not mention any gang charges or allegations; it concluded that Deputy Byrd "could not reasonably have known that the question would elicit an incriminating response . . . ." Neither the prosecution nor the defense asked the court to consider defendant's probable cause statement, which Deputy Byrd had also read and which noted that the shooting might have been gang motivated. (See part IV.A.1, *ante*.)

At the argument on the motion, the prosecutor asked the trial court to review Deputy Byrd's testimony at the section 402 hearing in the first trial or, alternatively, to accept her representation that Deputy Byrd had not corroborated defendant's claim of coercion.

The trial court ruled that, even if it were to accept defendant's version of the facts, defendant's statement was not coerced. It then added, "[T]he cases say that this kind of booking question is acceptable."

33

2.      *Analysis*.

Defendant now argues that the booking question was pretextual.  He forfeited this contention, however, by failing to raise it in the second trial.  (Evid. Code, § 353, subd. (a).)

In the first trial, the trial court had already decided that the booking question exception applied.  Presumably for this reason, in the second trial, defendant raised a somewhat different contention.  He asserted that Deputy Byrd noticed his Casa Blanca tattoos and threatened to house him with rival Hillside gang members, unless he admitted that he was, in fact, affiliated with Casa Blanca; thus, his statement was coerced.  The trial court found, however, that this would not constitute coercion.  Defendant does not challenge that ruling.

Admittedly, defendant's motion did assert that there was a *Miranda* violation, but only in boilerplate, cut-and-paste fashion.  For example, it discussed the standards for whether a *Miranda* waiver is voluntary, even though defendant had not waived his *Miranda* rights, voluntarily or involuntarily.  Likewise, it discussed how to determine whether a motorist is in custody for purposes of *Miranda*, an issue that was completely irrelevant to this case.

Judging by her argument at the hearing, the prosecutor seems to have believed that the only issue was coercion.  Likewise, as defendant concedes, "[t]he [trial] court based its decision on whether appellant was coerced . . . ."

We recognize that defendant did not have the burden of producing evidence. "When a defendant challenges the admissibility of defendant's postarrest statements on the ground they were elicited in violation of *Miranda*, the People have the burden of proving by a preponderance of the evidence that the statements were not the product of a *Miranda* violation. [Citations.]" (*People v. Gomez*, *supra*, 192 Cal.App.4th at p. 627.) However, defendant did have the burden of at least alerting the court to the fact that one of the issues he intended to raise was whether the booking question was pretextual. He fell short of doing so.

Separately and alternatively, even assuming this issue was adequately raised, the People met their burden by asking the trial court to review Deputy Byrd's testimony in the first trial. As discussed in part IV.A, *ante*, that testimony showed that the booking question exception did apply. Defendant now argues that Deputy Dawley's rebuttal testimony showed that the booking question was pretextual. However, he did not offer that testimony into evidence to support his motion. In any event, as we held in part IV.B, *ante*, Deputy Dawley did not actually contradict Deputy Byrd.

Finally, defendant argues that, to the extent that his defense counsel forfeited his present contention, either (1) by failing to make the same arguments as in the first trial, or (2) by failing to introduce the same evidence as in the first trial, they rendered ineffective assistance. As we discussed in part IV.B, however, Deputy Dawley's testimony fell short of showing that the booking question was, in fact, pretextual. Accordingly, defendant cannot show that these asserted failures were either unreasonable or prejudicial.

### 3. *Prosecutorial misconduct.*

In a related contention, defendant also argues that the prosecutor committed misconduct by citing the receiving sheet, which did not indicate that there were any gang issues in the case, rather than the probable cause form, which (at least arguably) did. Defense counsel forfeited this contention by failing to object on this ground at trial.

Defendant argues that this failure to object constituted ineffective assistance. Again, however, the thrust of defendant's motion to suppress was that his statement was coerced; it was not that the booking question exception did not apply or that the booking question was pretextual. Accordingly, whether Deputy Byrd had the probable cause statement, and whether it indicated that there were gang issues in the case, were largely irrelevant. This was reason enough for defense counsel not to object.

And finally, there was no misconduct. "'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1222.) The prosecutor did not conceal the probable cause statement. Although her written opposition mentioned only the receiving sheet, in the argument on the motion, she also asked the trial court to review *all* of Deputy Byrd's testimony from the section 402 hearing in the first trial. If it had done so, it would have become aware of the probable cause statement. In the end, however, as already discussed, it resolved the motion on other grounds.

## V

## PHOTOS FOUND ON MYSPACE

Defendant contends that, in the first trial, the trial court erred by admitting photos found on MySpace, because they had not been properly authenticated.

Defendant also contends that, in the second trial, defense counsel rendered ineffective assistance by failing to object to the MySpace photos.

A.    *Additional Factual and Procedural Background.*

In the first trial, while one Detective Stamps was on the stand, the prosecution started to question him about a MySpace page. Defense counsel objected based on hearsay. As a result, the trial court heard argument outside the presence of the jury.

The prosecution proffered the following photos:

1. Ex. 149A: A group photo of five men and two women, including Gonzales (a victim of the Christmas Eve shoooting); three of them were wearing Evans Street T-shirts.

2. Ex. 149B: A group photo of four men, including Gonzales. Gonzales was throwing a Casa Blanca gang sign; another man was throwing the gang sign of a Casa Blanca clique. Three of them were wearing Evans Street T-shirts.

3. Ex. 149E: A photo of two men. One of them was throwing the gang sign of a Casa Blanca clique.

4. Ex. 150: A group photo of 17 men, including Rangel, Lozano, and Gonzales (victims of the Christmas Eve shooting).

37

5. Ex. 152: A group photo of 12 men, including Rangel and Gonzales; one of them was throwing the gang sign of a Casa Blanca clique.

Several of the photos included gang-related captions and other writing. Defendant was not in any of the photos.

The photos were offered to show that victims of the Christmas Eve shooting were members of Casa Blanca and, hence, to show that defendant's motive was gang retaliation.

The prosecutor made an offer of proof that Detective Stamps (using an alias) had "friended" one of the people in one of the photos; that that person was a member of Casa Blanca; and that Detective Stamps had downloaded the photos from that person's MySpace pages.[10]

Defense counsel objected: "[I]f an officer or someone who can authenticate or talk about who is depicted in the pictures, that's fine. My objection came when the People started pointing out different words, and things of that nature, and attributing it to a particular person. Because we don't have a representative of MySpace to show who the

---

[10] In her offer of proof, the prosecutor indicated that the last name of the owner of the MySpace account was Cornejo, but she admitted that she was having trouble remembering his first name.

Detective Stamps then testified that one of the photos came from the MySpace account of Robert *Corrales*; defense counsel objected, however, and the trial court sustained the objection.

In the second trial, Detective Stamps testified that two of the photos came from the MySpace account of Robert *Carrillo*, while a third came from the account of either Carrillo or Michael Aguilar.

site was registered to.  We don't have any verification or authentication as to who placed the photos up there and actually typed in the language . . . ."

The trial court redacted most of the gang-related writing (though not the words, "the homies from big bad casa blanca evans st. gang" on Exhibit 150A).  Otherwise, it admitted the photos.

B.      *Analysis.*

Defense counsel did not raise defendant's present contention below.  He specifically *agreed* that an officer *could* testify about who was in the photos.  He objected only to the "words" accompanying the photos on the MySpace pages, because there was no evidence "as to who placed the photos up there and actually typed in the language . . . ."  The trial court largely obviated this objection by redacting most of the writing.  It did allow the words "the homies from big bad casa blanca evans st. gang" to remain.  However, defendant is not arguing that this was error.  Rather, his present contention is that the photos themselves were not shown to be accurate.  This particular contention has been forfeited.  (Evid. Code, § 353, subd. (a).)

Admittedly, if not forfeited, it would have merit.  A writing must be authenticated before it can be received in evidence.  (Evid. Code, § 1401.)  This means the proponent must demonstrate that the writing is what "the proponent of the evidence claims it is . . . ."  (Evid. Code, § 1400.)  A photo is a "writing" (Evid. Code, § 250) and hence must be authenticated.

39

*People v. Beckley* (2010) 185 Cal.App.4th 509 is on all fours, as it dealt with a photo downloaded from MySpace. There, the girlfriend of one of the defendants testified that, when she began dating him, she insisted that he stop associating with his gang. (*Id.* at pp. 513-514.) To impeach her, the prosecution introduced a photo showing her flashing a gang sign. A police officer testified that he had downloaded it from the boyfriend's MySpace page. The defendants objected based on lack of authentication. (*Id.* at p. 514.)

The appellate court held that the trial court erred by admitting the photo: "'It is well settled . . . that the testimony of a person who was present at the time a film was made that it accurately depicts what it purports to show is a legally sufficient foundation for its admission into evidence.' [Citation.] In addition, . . . authentication of a photograph 'may be provided by the aid of expert testimony . . . .' [Citation.] . . .

"Although defendants conceded that the face in the MySpace photograph was [the girlfriend]'s, the record does not contain . . . evidence sufficient to sustain a finding that it is the photograph that the prosecution claims it is, namely, an accurate depiction of [the girlfriend] actually flashing a gang sign. [The police officer] could not testify from his personal knowledge that the photograph truthfully portrayed [the girlfriend] flashing the gang sign and . . . no expert testified that the picture was not a '"composite" or "faked"' photograph. Such expert testimony is . . . critical today to prevent the admission of manipulated images . . . ." (*People v. Beckley*, *supra*, 185 Cal.App.4th at pp. 514-515.)

Here, identically, no witness with personal knowledge testified that the photos accurately depicted what they purported to show, and no expert testified that the photos were not faked. Accordingly, if defense counsel had objected based on lack of authentication, in either the first or the second trial, the MySpace photos should have been excluded.

Defendant cannot show, however, that the failure to object was either unreasonable or prejudicial. Even if the photos themselves had been excluded, the jury most likely would have learned what was in them, because they formed part of the basis for the prosecution gang expert's opinions.

In the first trial, a gang expert testified that he relied, in part, on the MySpace photos. Similarly, in the second trial, a gang expert testified that he relied, in part, on photos, evidently including the MySpace photos.

"[A]ny material that forms the basis of an expert's opinion testimony must be reliable. [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) However, "[s]o long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.] And . . . an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*Id*. at pp. 618-619.)

Although these principles are most often applied to hearsay, we see no reason why they should not also apply an unauthenticated writing. A writing that has not been

41

authenticated in accordance with the standards of the Evidence Code is not necessarily unreliable. An expert could reasonably rely on photos displayed on a gang member's MySpace page.

Admittedly, if photos are relevant *solely* as the basis for an expert's opinion, the photos themselves should not be admitted into evidence. The expert, however, could describe the photos and could explain how they factored into his or her opinion. Thus, it does not appear that the fact that the photos were actually admitted into evidence was prejudicial in either trial.

Moreover, defense counsel could reason that, if he objected to the admission of the photos themselves, the prosecution would spend even more time questioning the expert about their contents and having the expert explain their significance as a basis for his opinion. For this reason, defendant cannot show that his counsel had no rational tactical purpose for choosing not to object on authentication grounds.

VI

FAILURE TO OBJECT TO EVIDENCE OF CRIMES COMMITTED

BY AND AGAINST OTHER CASA BLANCA MEMBERS

Defendant contends that, in the second trial, defense counsel rendered ineffective assistance by failing to object to evidence of certain crimes committed by and against other members of Casa Blanca.

A. *Additional Factual and Procedural Background.*

In the second trial, the prosecution introduced the following evidence.

As already noted, Francisco Gonzales was a member of Casa Blanca. Like Rangel, he was one of the victims of the Christmas Eve shooting. In February 2006, Gonzales was involved in a drive-by shooting targeting a rival gang member's house. As a result, he was convicted of assault with a deadly weapon, with a gang enhancement.

Daniel "Pops" Avila was also a member of Casa Blanca. In June 2007, Avila confronted a Black man, called him a "nigger," and stabbed him. As a result, Avila was convicted of attempted murder, with a gang enhancement.

Jesse Lopez, too, was a member of Casa Blanca. He stole money and a skateboard from a child. As a result, he was convicted of robbery, with a gang allegation.

Defense counsel did not object to any of this evidence (except, in one instance, as nonresponsive).

B.     *Analysis.*

Defendant argues that defense counsel should have objected to the foregoing evidence as more prejudicial than probative.

These crimes committed by members of Casa Blanca were directly relevant to prove the gang enhancements and the gang special circumstance. One element of these is that the gang's primary activities include the commission of specified crimes, such as assault with a deadly weapon, attempted murder, and robbery. (Pen. Code, §§ 186.22,

subds. (b), (e)(1)-(3), (f), 190.2, subd. (a)(22).) The evidence supported the gang expert's opinion that the primary activities of Casa Blanca included violent assaults.[11]

We also note that this evidence was not particularly prejudicial. We recognize that "[e]ven if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it. [Citation.]' [Citations.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.) Here, however, there was strong evidence that defendant had murdered an 11-year-old child and had attempted to murder that child's entire family. There was also extensive evidence that gangs in general, and Casa Blanca in particular, were devoted to violent crime. In this context, the evidence of these three particular crimes was extremely brief and not inflammatory in the least.

Defendant points out that, in the first trial, a different trial judge limited, sua sponte, the evidence of crimes committed by other members of Casa Blanca. Thus, for example, that judge excluded evidence that Avila had committed a stabbing. This does tend to suggest that, in the second trial, defense counsel should have at least tried to exclude the evidence. However, it does not mean the second trial judge *had* to exclude it. "To say that . . . decisions are discretionary is to say that different reasonable decision makers . . . could arrive at different decisions, even on the same facts." (*People v. Garcia*

_____

[11] These crimes could not be used as predicate offenses, however, because they were committed *after* the charged offenses. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458; *People v. Godinez* (1993) 17 Cal.App.4th 1363, 1368-1370.)

44

(1995) 32 Cal.App.4th 1756, 1771-1772 [Fourth Dist., Div. Two].) Given the substantial probative value and minimal prejudicial effect of the evidence, we cannot say that the failure to object to it undermines our confidence in the outcome.

Defendant also argues that defense counsel was ineffective in failing to object to evidence of two crimes committed *against* members of Casa Blanca.

First, Gonzales had actually been shot twice — not only in the Christmas Eve shooting, but also on an unspecified previous occasion. Evidence of the previous shooting, however, was relevant to explain why one photo of Gonzales showed him in a wheelchair. The prosecutor had the witness clarify that Gonzales was in the wheelchair due to the earlier shooting, not the Christmas Eve shooting. The witness also clarified that Gonzales was in the wheelchair only temporarily; he recovered and was able to walk, though with a limp.

Second, in 2006, Peter Herrera, a member of Casa Blanca, was shot and killed by an unknown person. This evidence, however, was relevant to show that certain tattoos and graffiti saying "RIP Peter" were indicative of membership in Casa Blanca.

In addition, this evidence that two members of Casa Blanca had been *victims* of crimes was not particularly inflammatory, especially in the context of all of the other gang evidence.

Next, defendant contends that defense counsel rendered ineffective assistance by failing to object to evidence of gang graffiti found on a picnic table at Villegas Park as more prejudicial than probative.

45

The graffiti were probative to show that Villegas Park was in Casa Blanca territory. This, in turn, was relevant to show that defendant was a member of Casa Blanca, for two reasons. First, in 2001, defendant fired a .22 rifle into the air at Villegas Park. According to the gang expert, this incident showed that defendant was a member of Casa Blanca, in part because it took place in Villegas Park. Second, in April 2002, defendant admitted to a police officer that he was a member of Casa Blanca. According to the gang expert, it was significant that this contact took place in Villegas Park.

Separately and alternatively, the graffiti were not particularly prejudicial. As defense counsel brought out, defendant's name did not appear in the graffiti. Moreover, defacing a picnic table was not exactly the most heinous gang conduct that the jury heard about.

Finally, defendant contends that defense counsel rendered ineffective assistance by failing to object to a set of photos seized in a search of Gonzales's house, again, as more prejudicial than probative. The photos showed Peter Herrera, Daniel Rangel (Michael Rangel's brother), and Eric Lozano (Randy Lozano's brother) posing with people who were throwing Casa Blanca gang signs.[12] These photos were relevant to show that the victims of the Christmas Eve shooting were members of Casa Blanca. Also, again, the photos were not particularly prejudicial. They did not show defendant. They also did not

_____

[12]     An unredacted version of the exhibit has been transmitted to us. However, it appears that a redacted version was actually admitted.

46

show any illegal conduct (except possibly underage drinking). Thus, the failure to object to them was neither unreasonable nor prejudicial.

## VII

## FAILURE TO REQUEST A LIMITING INSTRUCTION

## REGARDING THE GANG EVIDENCE

Defendant contends that, in both trials, his defense counsel rendered ineffective assistance by failing to request CALCRIM No. 1403.

CALCRIM No. 1403 may be given, on request, when evidence of "gang activity" has been admitted. (Bench Notes to CALCRIM No. 1403 (2012 ed.), p. 1172.) It would have stated, among other things, "You may not conclude from this evidence that the defendant is a person of bad character or that [he] has a disposition to commit crime."

Reasonable defense counsel could have decided not to request such an instruction to avoid calling the jury's attention to the gang evidence. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934.) Hence, defendant has not shown that defense counsel was ineffective.

## VIII

## CUMULATIVE PREJUDICE FROM

## ASSERTEDLY INADMISSIBLE GANG EVIDENCE

We have already held that defense counsel was not ineffective in failing to object to (1) the MySpace photos (see part V, *ante*); (2) evidence of other crimes committed by and against other Casa Blanca members (see part VI, *ante*); (3) evidence of gang graffiti

47

on a picnic table at Villegas Park (*ibid*.); and (4) photos seized at Gonzales's house (*ibid*.).

Here, we consider, separately and independently, whether these asserted instances of ineffective assistance were cumulatively prejudicial. We conclude that they were not, because, in the context of all of the other gang evidence in the case, these particular items of evidence were trivial.

In arguing prejudice, defendant relies on *People v. Albarran* (2007) 149 Cal.App.4th 214. There, however, despite the fact that the defendant was a gang member, there was insufficient evidence that the crime was, in fact, gang related. (*Id*. at p. 227.) Accordingly, the evidence typically used to prove a gang allegation — crimes committed by other gang members, threats against the police, contacts between other gang members, and references to the Mexican Mafia — was irrelevant as well as prejudicial. (*Id*. at pp. 227-228.) Here, by contrast, there was overwhelming evidence that the crime was gang related. Thus, quite appropriately, the juries in both trials heard about other assaults and murders committed by members of Casa Blanca. They heard how gang rivalries can escalate due to the spiral of retaliation. They heard how gang members intimidate witnesses.

By contrast, the MySpace photos, the photos from Gonzales's house, and the gang graffiti did not depict any violent or felonious conduct. Admittedly, the evidence of the crimes committed by Gonzales, Avila, and Lopez did relate to such conduct; however, as already discussed (see part VI.B, *ante*), it did not take up much time and did not go into

much detail. Significantly, none of this evidence directly implicated defendant as a member of Casa Blanca. Thus, it did not make the jury any more likely to find that he was a gang member.

We also have already held that defense counsel was not ineffective in failing to request an instruction on the limited purpose of the gang evidence (see part VII, *ante*). Alternatively, we now conclude that this asserted instance of ineffective assistance was not prejudicial, even cumulatively. Precisely because the gang evidence tended strongly to establish a gang motivation for the crime, unlike in *Albarran*, the purpose of the evidence would have been apparent. "The evidence was so obviously admissible for multiple relevant purposes, and was so obviously not introduced merely to prove bad character, that an instruction on limited admissibility was not essential to the jury's understanding of the case." (*People v. Haylock* (1980) 113 Cal.App.3d 146, 150.)

IX

FAILURE TO REQUEST AN INSTRUCTION ON UNCHARGED CRIMES

Defendant contends that, in both trials, his defense counsel rendered ineffective assistance by failing to request CALCRIM No. 375, regarding evidence of uncharged crimes.

A.    *Additional Factual and Procedural Background*.

In the first trial, defendant took the stand. Anticipating impeachment, he admitted the following two juvenile adjudications:

49

1. In 2001, while at Villegas Park, defendant fired a .22 rifle into the air. He was arrested and spent time in juvenile hall. When he violated his probation by failing a drug test, he was sent to a different juvenile facility.

2. Defendant escaped from the latter juvenile facility. He was arrested and sent back to juvenile hall.

In the second trial, the prosecution once again introduced evidence of the 2001 incident in which defendant fired a .22 rifle into the air at Villegas Park, this time as part of the basis for the gang expert's opinion that defendant was a gang member.

The gang expert also testified that in 2003, while in juvenile hall, defendant and another Casa Blanca member had beaten up someone who disrespected Casa Blanca.

Finally, in the second trial, the prosecution introduced evidence of the assault on Valenciano with a firearm and of the robbery of beer from Perez, even though defendant had already been found guilty of these crimes in the first trial.

B.      *Analysis*.

CALCRIM No. 375 should be given, on request, when evidence of an uncharged offense or other "bad act" has been introduced under Evidence Code section 1101, subdivision (b). (Bench Notes to CALCRIM No. 375 (2012 ed.), p. 155.) This instruction would have stated, among other things, "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

The People point out that CALCRIM No. 375 did not apply, because none of the uncharged crimes evidence was admitted under Evidence Code section 1101, subdivision

50

(b).  In his reply brief, defendant does not disagree; rather, he argues, for the first time, that defense counsel rendered ineffective assistance by failing to request *an appropriately modified version* of CALCRIM No. 375.  He forfeited this contention, however, by failing to raise it in his opening brief.  (*People v. Lynch* (2012) 209 Cal.App.4th 353, 362, fn. 6.)

Separately and alternatively, we also reject this contention on the merits.  Defense counsel could reasonably have decided not to request such an instruction to avoid calling the jury's attention to the uncharged crimes evidence.  (*People v. Hinton* (2006) 37 Cal.4th 839, 878.)  Thus, defendant has not shown that defense counsel was ineffective.

X

ABSTRACT OF JUDGMENT

Defendant contends that the abstract of judgment erroneously reflects a parole revocation restitution fine.  The People concede the error.

The trial court correctly ruled that, because it was sentencing defendant to life without the possibility of parole, it would not impose a parole revocation restitution fine.  Nevertheless, the abstract of judgment recites that a revocation restitution fine was imposed.

In our disposition, we will direct the trial court to correct the abstract.

XI

DISPOSITION

The judgment is affirmed. The clerk of the superior court is directed to file an amended abstract of judgment that does not include a parole revocation restitution fine (see part X, *ante*) and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.